## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

### Civil Action, File Number _____

| | |
|---|---|
| Huntington and Caitriona B. Barclay<br>1394 Village Road<br>Box 125<br>Silver Lake, NH  03875, | ) <br> ) <br> ) <br> ) <br> ) |
| Cecile and Joseph Bates<br>1160 Whittier Rd<br>Tamworth, NH<br>(mailing address: West Ossipee, NH  03890), | ) <br> ) <br> ) <br> ) <br> ) |
| Diana M. Beliard<br>3191 Chinook Trial<br>Wonalancet, NH 03897, | ) **COMPLAINT FOR**<br>) **DECLARATORY RELIEF**<br>) |
| Aron Bernstein and Susan Goldhor<br>322 Great Hill Road<br>Tamworth, NH  03886, | ) <br> ) <br> ) <br> ) |
| Amy K. and Thaddeus B. Berrier<br>139 Bryant Road<br>Tamworth, NH 03886, | ) <br> ) <br> ) <br> ) |
| Geoffrey B. and Andrea G. Burke<br>103 Old White Mountain Camp Rd.<br>Tamworth, NH  03886, | ) <br> ) <br> ) <br> ) |
| Anita N. Cameron<br>19 Nudd Road<br>West Ossipee, NH  03890, | ) <br> ) <br> ) <br> ) |
| Joan A. Casarotto<br>630 Cleveland Hill Road<br>Tamworth, NH  03886, | ) <br> ) <br> ) <br> ) |
| Frank and Kimberly Drew<br>39 May's Way<br>Tamworth, NH  03886, | ) <br> ) <br> ) |

David L. Eastman                              )
13 Bryant Road                                )
Tamworth, NH  03886                           )
PO Box 59                                     )
Ctr. Sandwich, NH  03227,                     )
                                              )
Stephen J. and Wendy Gaal                     )
334 Pease Hill Road                           )
Tamworth, NH  03886                           )
PO Box 91                                     )
North Sandwich, NH  03259,                    )
                                              )
Christina Gill and John P. Felice             )
68 Old White Mountain Camp Road               )
PO Box 235                                    )
Tamworth, NH  03886,                          )
                                              )
Joan Gilmour                                  )
308 Mountain Road                             )
PO Box F                                      )
South Tamworth, NH  03883,                    )
                                              )
Arvid and Shirley Gustavson                   )
601 East Shore Drive                          )
Silver Lake, NH  03875,                       )
                                              )
Bernard Haines and Gena Morgan                )
15 Mays Way                                   )
Tamworth, NH  03886,                          )
                                              )
Kent Hemingway, Sr.                           )
224 Hidden Road                               )
PO Box 148                                    )
Tamworth, NH  03886,                          )
                                              )
Carolyn and Kent Hemingway, Jr.               )
276 Great Hill Road                           )
Tamworth, NH  03886,                          )
                                              )
John Howell and Laura Weymouth                )
3234 Chinook Trail                            )
Wonalancet, NH  03897,                        )
                                              )
Peggy Johnson                                 )
3094 Chinook Trial                            )
Wonalancet, NH  03897,                        )

Sara & Brian Kelley                        )
282 Mountain Rd                            )
South Tamworth, NH  03883,                 )
                                           )
Andrea Kennett                             )
Old Mail Road                              )
PO Box 535                                 )
Tamworth, NH  03886,                       )
                                           )
Anthony Leo and Rae LaForge                )
57 May's Way                               )
Tamworth, NH                               )
PO Box 487                                 )
West Ossipee, NH  03890,                   )
                                           )
David M. Little                            )
468 Great Hill Road                        )
Tamworth, NH  03886,                       )
                                           )
John and Arlene Littlefield                )
74 May's Way                               )
Tamworth, NH  03886,                       )
                                           )
Lois and Edgar Merrithew                   )
60 May's Way                               )
Tamworth, NH  03886,                       )
                                           )
Michele Miller                             )
3805 Chinook Trail                         )
Wonalancet, NH  03897-5582,                )
                                           )
Ed Morin                                   )
206 Summit View Drive                      )
Tamworth NH                                )
PO Box 834                                 )
West Ossipee, NH  03880,                   )
                                           )
Phyllis A. Nudd                            )
4 Nudd Road                                )
West Ossipee, NH  03890,                   )
                                           )
Linda J. Murphy Williams                   )
20 Bryant Road                             )
Tamworth, NH  03886,                       )

Sheldon P. and Nina Perry        )
191 Great Hill Road              )
Tamworth, NH  03886,             )
                                 )
Jack Pine                        )
71 Mays Way                      )
Tamworth, NH  03886,             )
                                 )
Donna Polhamus                   )
39 Mountainview Estates Rd.      )
PO Box 101                       )
Tamworth, NH  03886,             )
                                 )
Richard and Marion Posner        )
1153 Cleveland Hill Road         )
Tamworth, NH  03886,             )
                                 )
Lianne D. Prentice               )
Christopher R. Moneypenny        )
86 Mason Hill Road               )
South Tamworth, NH  03883,       )
                                 )
Jo Anne M. Rainville             )
61 Benjamin Wentworth Dr.        )
Chocorua, NH  03817,             )
                                 )
Cynthia A. Richards              )
130 Mason Hill Rd.               )
South Tamworth                   )
PO Box 816                       )
West Ossipee, NH  03890,         )
                                 )
Margaret Rieser                  )
55 Chocorua Road                 )
PO Box 466                       )
Tamworth, NH 03886,              )

St. Andrews Church:                              )
The Reverend Heidi Frantz-Dale, Rector          )
(on behalf of the Vestry and Parish)            )
Saint Andrew's-in-the-Valley Episcopal Church )
678 Whittier Road, PO Box 436                   )
Tamworth, NH  03886                             )
    and                     )
The Right Rev. V. Gene Robinson                 )
The Episcopal Diocese of New Hampshire          )
63 Green Street                                 )
Concord, NH  03301,                             )
                                                )
Jim Shea and Cathy Arseneault-Shea              )
127 Mason Hill Rd.                              )
P.O. Box E                                      )
South Tamworth, NH  03883,                      )
                                                )
Lyn Slanetz                                     )
1017 East Shore Drive                           )
Silver Lake, NH  03875,                         )
                                                )
Mary B. and D. Edward I. Smyth                  )
134 Mt. Mexico Road                             )
Wonalancet, NH  03897,                          )
                                                )
Helen Steele                                    )
3329 Chinook Trail                              )
Wonalancet, NH  03897,                          )
                                                )
Robert Streeter and Amy Carter                  )
133 Pease Hill Rd.                              )
PO Box 316                                       )
Tamworth, NH  03886,                            )
                                                )
Peter and Elisabeth Swiriduk                    )
66 Mays Way                                     )
Tamworth, NH  03889,                            )
                                                )
Brenda F. Taylor                                )
61 Benjamin Wentworth Dr.                       )
Chocorua, NH  03817,                            )
                                                )
Paul and Hope Therrien                          )
66 Mays Way                                     )
Tamworth NH 03886,                              )

Virginia C. Thomas                                )
904 Whittier Road                                 )
Tamworth, NH  03886,                              )
                                                  )
Harry Thompson                                    )
117 Whittier Rd                                   )
Tamworth, NH                                      )
(mailing address: West Ossipee, NH  03890),       )
                                                  )
Katharine T. Thompson                             )
611 Mountain Rd                                   )
P.O. Box 48                                       )
South Tamworth, NH  03883,                        )
                                                  )
Ruth G. Timchak                                   )
418 Old Mail Road                                 )
Tamworth, NH  03886,                              )
                                                  )
Thomas and Katherine C. Vachon                    )
1281 Cleveland Hill Road                          )
Tamworth, NH  03886,                              )
                                                  )
Richard Whiting                                   )
188 Gilman Valley Road                            )
Tamworth, NH  03886,                              )
                                                  )
Jennifer Hocking Wiley                            )
93 Downs Road                                     )
PO Box 492                                        )
Madison, NH  03849,                               )
                                                  )
Peter & Jacqueline Whyte                          )
260 Summit View Drive                             )
PO Box 124                                        )
Tamworth, NH  03886,                              )
                                                  )
        and                                       )
                                                  )
William F. and Louise M. Wrobleski                )
1445 Ossipee Mountain Highway                     )
PO Box 373                                        )
Tamworth, NH  03886,                              )
                        Plaintiffs                )

| | |
|---|---|
| vs. | ) |
| | ) |
| U.S. Army Corps of Engineers, | ) |
| Executive Office, New England District | ) |
| 696 Virginia Road | ) |
| Concord, MA 01742-2715, | ) |
| | ) |
| Lt. General Carl A. Strock, | ) |
|   Chief Engineer, U.S. Army Corps | ) |
|   Of Engineers, | ) |
| 696 Virginia Road | ) |
| Concord, MA 01742-2715, | ) |
| | ) |
| Colonel Curtis Phalken, | ) |
|   New England District Commander, | ) |
|   U.S. Army Corps of Engineers | ) |
| 696 Virginia Road | ) |
| Concord, MA 01742-2715, | ) |
| | ) |
|   and | ) |
| | ) |
| Motorsports Holdings, LLC, | ) |
| 2 Chester Road, Suite 304 | ) |
| Derry, NH 03038, | ) |
| Defendants | ) |

## COMPLAINT FOR DECLARATORY RELIEF

1.      Plaintiffs bring this action seeking declaratory relief against the U.S. Army Corps of Engineers ("ACOE") for failing to comply with Sections 401 and 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1341 et seq. and the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq., prior to granting an individual CWA permit authorizing construction of a racetrack facility on the north slope of Mt. Whittier in Tamworth, New Hampshire.

2.      Defendant Motorsports Holdings, LLC ("MH") has proposed construction of a 251-acre racetrack on property in Tamworth, New Hampshire which is surrounded by more than 20,000 acres of conservation land.  Because the project involves dredging and filling of jurisdictional wetlands, the project required a permit from the ACOE.

3.      The ACOE violated the CWA in issuing a permit for this project.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 5

U.S.C. §§ 702 and 706 (1), (2)(A), (C) and (D) (Administrative Procedures Act); 28 U.S.C. §

1361 (mandamus); and 28 U.S.C. § 2201 (Declaratory Judgment Act).

5.      Venue is proper in this District under 28 U.S.C. § 1391(b), as the actions giving

rise to the claim occurred in the District of New Hampshire, and 28 U.S.C. § 1391(e) because it is

a civil action against an agency or officer of an agency of the United States acting in his official

capacity under 5 U.S.C. § 703.

**PARTIES**

6.      Plaintiffs in this action are property owners in and around the Town of Tamworth,

New Hampshire.  Each of the plaintiffs is either:  (a) a direct abutter to the proposed racetrack

project site owned by MH, (b) a landowner in close enough proximity to the site that the proposed

project will have serious and damaging effects on them and the use of their property, (c) the owner

of real property in Tamworth upon which the individual pays property taxes, and/or (d) a resident

of Tamworth.  Each plaintiff is threatened with harm in several ways, including the destruction of

and damage to their property, impairment of their water supply, and loss of the use, enjoyment and

value of their property.   In particular, due to their location near the site, each plaintiff is

threatened by the occurrence of any of the following impacts which will occur as a result of the

proposal by MH to construct a racetrack and motorsports park in Tamworth: damage or

destruction of wetlands beyond the border of the proposed project site from erosion and

sedimentation, flooding, contamination of groundwater and the drinking water supply,

contamination of the Bearcamp River and other surface waters, noise pollution, loss and damage

to viewscapes and the aesthetic quality of the property, disruption and loss of wildlife and habitat, loss of the recreational and conservation value of their property, and diminution of property values.

7.      Defendant Lt. General Carl A. Strock is Chief Engineer of the U.S. Army Corps of Engineers, and is sued in his official capacity.

8.      Defendant Colonel Curtis Phalken is the New England District Commander of the Army Corps, and is sued in his official capacity.

9.      Defendant Motorsports Holdings, LLC is the permit applicant/permittee in this matter and is a limited liability company incorporated in the State of Delaware.

## FACTS CONCERNING THE PROJECT

10.      MH plans to construct a 251-acre racetrack and motorsports park on 242 acres it currently owns and an additional nine (9) acres it plans to lease centered on the north slope of Mount Whittier in the Ossipee Mountains in Tamworth, New Hampshire.

11.      The proposed Project consists of a 3.1 mile closed-loop racetrack as well as numerous accessory buildings including an administration building, vehicle maintenance building, hotel, restaurant, club house and temporary residential facilities and private race car garages ("garagemahalls") as well as various access roads and paved parking areas.

12.      The Project site is located directly over primary and secondary recharge areas for the Ossipee Aquifer.  The Aquifer, which is the major source of drinking water for Tamworth and many other towns in the State of New Hampshire and the State of Maine, is a high-yield aquifer that can recharge quickly with rainwater, and is also highly vulnerable to contamination.

13.     The project site is surrounded by more than 20,000 acres of conservation land, including 14 parcels adjacent to the project site and an additional 108 parcels in the immediate vicinity, representing an investment of more than $10 million of public and private funds.

14.     The proposed double closed-loop racetrack will be the width of a New Hampshire highway on which amateur drivers will race cars at extremely high speeds.  This closed-loop racetrack will cross wetlands seventeen (17) times.

15      According to the project's permit application filed by MH with the ACOE, the project will include, among other activities, support services for repair, garaging and servicing for high performance vehicles, including "paddock" areas, a facility maintenance building, and an auto repair and high performance tuning shop for repair, maintenance and storage of vehicles.

16      As proposed by MH in its application, the project will involve seventeen (17) wetland impact areas, approximately four (4) which relate to access roads and approximately thirteen (13) which relate to construction of the racetrack itself or the buildings and structures associated with the racetrack.

17      All of the proposed activities within jurisdictional wetlands will require the erection or construction of structures or buildings and/or will alter the natural surface configuration by the addition of fill or dredging, and/or will involve the removal or deposition of material or obstruction, alteration, or pollution of wetlands.

### FACTS CONCERNING THE ACOE PERMIT

18      The ACOE has regulatory powers under 42 U.S.C. § 1344 to issue permits for the discharge of dredged or filled material into waters of the United States, including certain wetlands. This statutory provision was adopted as Section 404 of the Federal Water Pollution Control Act Amendments of 1972, also knows as the "Clean Water Act."

19      The overwhelming majority of projects impacting federal jurisdictional wetlands, and requiring an ACOE permit, are addressed under what is known as the New Hampshire State Program General Permit (SPGP), under which the ACOE relies on the State's wetland permitting process and does not conduct an independent review.  However, an individual permit is required for projects with potentially significant impacts.

20.     In this case, MH requested that its project be permitted under the SPGP.  However, the ACOE determined, by letter dated January 7, 2004, that the project was not eligible to be addressed under the SPGP and that the application would be reviewed under individual permit procedures.  In support of that determination, the ACOE stated as follows:  "The determination that your project will have more than minor impacts was made after consideration of several factors, which included the uncertainty of secondary impacts, the project's possible impacts on aquifer resources, and significant public interest in the project."

21      On or about March 4, 2004, MH filed with the ACOE a Section 404 Individual Permit Application for its project.

22.     Members of the public submitted comments regarding MH's permit application. The Plaintiffs in this suit submitted detailed comments regarding the application on or about August 13, 2004 and supplemented those comments on or about March 11, 2005.  The Plaintiffs, through counsel, also provided testimony at the public hearing on said application held on October 6, 2004.

23.     On or about August 26, 2005, the ACOE issued MH a Section 404 Permit, authorizing MH to "fill approximately .73 acres (31,711 sq. ft.) of inland wetlands and streams to construct a motorsports country club with an associated 3.1-mile road course," upon certain conditions.

24.     By letter dated April 27, 2006, the Plaintiffs, through counsel, requested that the ACOE reconsider its permit, specifically requesting reconsideration of that portion of the permit which accepted MH's proposed noise restriction for operations at the project.

25.     By letter dated August 4, 2006, the ACOE denied Plaintiffs' request for reconsideration.

## LEGAL BACKGROUND

26.     The CWA is a comprehensive statute enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

27.     To achieve this goal, the CWA prohibits the discharge of any "pollutant," defined broadly to include dredged or fill material, into "navigable waters," defined broadly to include most wetlands, unless authorized by a CWA permit. 33 U.S.C. §§ 1311(a), 1341 et seq.; see also 33 U.S.C. § 1362(6) (defining "pollutant"); 33 U.S.C. § 1362(7) (defining "navigable waters"); 33 C.F.R. § 328.3 (further defining "navigable waters").

28.     Section 404 of the CWA authorizes the Secretary of the Army, acting through its Chief of Engineers (the Army Corps) to regulate discharges of dredged or fill material through the issuance of permits. 33 U.S.C. § 1344(a).

29.     Both the ACOE and the United States Environmental Protection Agency ("EPA") define the "waters of the United States" to include most wetlands.

30.     Individual Section 404 permits are processed under 33 U.S.C. § 1344(a) – (c) and must be denied if the ACOE "determines, after notice and opportunity for public hearings, that the [proposal] will have an unacceptable adverse affect on . . . wildlife, or recreational areas." 33 U.S.C. § 1344(c).

31.     The ACOE permit issued in this case is an "'individual permit' [which is] an [Army Corps] authorization that is issued following a case-by-case evaluation of a specific structure or work in accordance with the procedures of [33 CFR Part 322] and 33 CFR Part 325, and a determination that the proposed structure or work is in the public interest pursuant to 33 CFR Part 320." 33 CFR 322.2(e).

32.     The regulations implementing the CWA provide that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic environment." 33 U.S.C. § 230.10(a). "Most wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(1).

33.     In addition, the Army Corps must conduct an independent assessment of the project's merits to determine whether it is in the public interest, weighing the project's benefits versus its detriments, including its cumulative impact. Id. §§ 323.6(a), 320.4(a).

34.     Relative to the ACOE's obligation to determine whether a project is in "the public interest," 33 C.F.R. § 320.4(a)(1) provides:

> The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have to the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process. That decision should reflect the national concern for both protection and utilization of important resources. All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use,

navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people. . . .  [A] permit will be granted unless the district engineer determines that it would be contrary to the public interest. (Emphasis added.

35.     "Before issuing any dredge or fill permit, the Corps is required to conduct a 'public interest' review.  This review considers virtually all aspects of a project: 'conservation, economics, aesthetics, general environmental concerns, historic values, fish and wildlife values, flood damage prevention, land use, navigation, recreation, water supply, water quality, energy needs, safety, food production, and, in general, the needs and welfare of the people.'  33 C.F.R. § 320.4(a)(1) . . ."  Buttrey v. United States, 690 F.2d 1170, 1180 (5th Cir. 1982), cert. den., 461 U.S. 927, 103 S.Ct. 2087 (1983).

36.     "[T]he district engineer will determine in accordance with the record and applicable regulations whether or not the permit should be issued.  He shall prepare a statement of findings (SOF) or, where an [Environmental Impact Statement ("EIS")] has been prepared, a record of decision (ROD), on all permit decisions.  The SOF or ROD shall include the district engineer's views on the probable effect of the proposed work on the public interest including conformity with the guidelines published for the discharge of dredged or fill material into waters of the United States (or CFR Part 230)."  33 C.F.R. § 325.2(a)(6).

## COUNT I
## DECLARATORY JUDGMENT THAT ACOE'S PERMIT
## ISSUANCE WAS ARBITRARY AND CAPRICIOUS

37.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs.

38.     The CWA explicitly provides a private right of action under which "any citizen may commence a civil action on his own behalf . . .  against any person . . .  who is alleged to be in violation of" the various provisions of the CWA.  33 U.S.C. § 1365(a)(1).

39.     In addition, the APA provides that any "person suffering legal wrong because of agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  See also 5 U.S.C. § 704 ("[F]inal agency action for which there is no other adequate remedy in a court [is] subject to judicial review.")

40.     As the First Circuit has recognized, this Complaint, which alleges a violation of the CWA provisions, and all similar claims, challenge the correctness of the ACOE's substantive result, not simply the adequacy of the procedure followed by the agency in reaching it:

> The Clean Water Act (CWA) was "a bold and sweeping legislative initiative," . . . enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's water." . . . "This objective incorporated a broad, systemic view of the goal of maintaining and improving water quality: as the House Report on the legislation put it, 'the word "integrity" . . . refers to a condition in which the natural structure and function of ecosystems [are] maintained.'" . . .  In contrast to NEPA's focus on process, the CWA is substantive, focusing upon the "integrity of the Nation's Waters, not the permit process."

Dubois v. Department of Agriculture, 102 F.3d 1273, 1295 (1st Cir. 1996) (emphasis added, citations omitted); see also Carmel-By-The-Sea v. U.S. Dept. Of Transportation, 123 F.3d 1142, 1152 (9th Cir. 1997) (NEPA "is procedural and is simply not as demanding as the Clean Water Act on the issue of wetlands"  (citing Dubois)).

41.     Under the Administrative Procedures Act (APA), this Court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).

42.     Agency action must be set aside if the agency relies on factors which Congress did not intend for it to consider, entirely fails to consider an important aspect of the problem, offers an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Manufacturers Ass'n of U.S., Inc. v. State Farm Mutual Auto, Inc., 463 U.S. 29, 43
(1983).

43.    Much of the public comments focused on the noise to be associated with MH's
proposed project.  Written comments submitted by Plaintiffs in this case highlighted the issue as
follows:

> The noise that this racetrack will generate is of paramount concern to the
> surrounding community.  Up to 25 vehicles or more will be racing at high speeds
> on the track at any one time, generating noise pollution that will travel well beyond
> the boarders of the site and negatively impact a nearby church as well as
> residential, conservation, and recreational properties both immediately adjacent to
> the site and in neighboring communities.
>
> . . .
>
> The Army Corp is charged with evaluating the effect that proposed projects will
> have on the public interest, including aesthetics, recreation, the needs and welfare
> of the people, and considerations of private ownership.  Unless the project
> incorporates substantial noise barriers and operational limits, noise of the type and
> levels that this project will generate will have a significantly adverse impact on
> each of those considerations of the public interest.

44.    The ACOE recognized the issue of noise as a significant factor in its "public
interest review" pursuant to 33 C.F.R. § 320.4.  Specifically, in its "Environmental Assessment
and Statement of Findings" within its permit decision, the ACOE identified noise as having an
"adverse" public interest effect.  The Assessment further noted that, "Noise was raised as the
largest concern by the public and the Corps gave this concern a great deal of attention."
Approximately two-and-one-half pages of the ACOE's Environmental Assessment was addressed
to its analysis of the noise issue.

45.    As set forth above, "the decision whether to authorize a proposal, and if so, the
conditions under which it will be allowed to occur, are . . .  determined by the outcome of this
[public interest review] general balancing process."  33 C.F.R. §320.4 (a)(1).  In imposing

conditions related to noise, the ACOE accepted MH's proposed noise restriction for operations at

its facility.  In particular, the ACOE adopted the following proposal of MH:

> Allowable Sound Levels – during all hours of operation and anywhere on-site, with
> the exception of Sunday morning before 11:00 a.m., no vehicle may exceed an
> average sound limit of 92 dBA at 50 feet from the source, nor a maximum sound
> limit of 99 dBA at 50 feet from the source.

46.     As explained further below, the ACOE's acceptance of MH's proposed noise

restriction was arbitrary and capricious since the effect of the maximum sound limit of 99 dBA is

twice as loud as the noise limitation proposed by the ACOE's own expert.

47.     The significance of the noise issue led the ACOE to hire its own noise expert,

Acentech, to evaluate noise impacts from the proposed project.  The ACOE's Environmental

Assessment contains a summary of the parties' submissions on the issue of noise that led the

Corps to commission the Acentech report:

> The applicant hired Tech Environmental, Inc. (TE) to perform a sound study . . .
> which resulted in the applicant proposing virtually unlimited generation of noise at
> the facility.  Focus Tamworth, an opponent of the project, hired Harris Miller
> Miller & Hanson Inc. (HMMH) to review the TE study and make
> recommendations.  HMMH produced a report . . . [which] recommended to
> severely limit the applicant's generation of noise at the facility.  The HMMH
> recommendation included the limitation of noise to 69 dBA at any point from the
> property line during track operations. . . . The New Hampshire Department of
> Environmental Services had determined that they had no jurisdiction to determine
> the impacts of noise at the project. . . .[T]he Corps faced the task of analyzing two
> competing noise studies . . .. As a result of this, the Corps hired an independent
> and private noise expert, Acentech, Inc. . . .

48.     Acentech also recognized the significance of the noise issue as it related to this

project, stating in its report to the ACOE:

> It must be recognized that this facility, as proposed, will operate during daylight
> hours year-round and the sound generated by its participants will be heard
> throughout the community.  The frequency, content and the duration of the noise
> events that could be caused by this facility will sound like no other sound sources

in the area.  Without appropriate limits, this will change the environment of the Tamworth area.

49.     The Acentech report was provided to the ACOE by letter dated March 15, 2005.

The Acentech report utterly discredited the report of MH's noise expert, Tech Environmental,

which was the basis for MH's proposed noise limit (which was ultimately accepted by the

ACOE).  As explained in the Acentech report:

> The TE report used the Federal Highway Administration (FHWA) Traffic Noise Model (TNM) to predict the noise levels that would be generated by the proposed facility.  Independent of the TNM modeling results, the attached [communications from FHWA officials] are testament to TNM not being appropriate or adequate for modeling race track noise.  Since the model that was used as a basis for the TE analysis was not appropriate for this project, it is unnecessary to further discuss issues with the TE modeling effort.
>
> …
>
> [T]he TE report does not address the potential impact of the proposed facility on the community.  Its modeling is inappropriate and its criteria are deficient for a proposed facility of this type to peacefully coexist with a nearby residential community.

50.     The ACOE recognized and accepted this critical finding of the Acentech report, stating in its Environmental Assessment:

> Acentech's report indicated that the applicant had characterized the proposed project as being "non-race track" in nature and therefore had used model technique and criteria based on Federal Highway Administration Traffic Model, New Hampshire Department of Transportation and U.S. Environmental Protection Agency criteria.  This was deemed inappropriate, since the Corps had determined the proposed project was to be characterized as "race track" for purposes of the sound analysis, only, even though the applicant considered the project a road course.

51.     As a result of these deficiencies in modeling, the ACOE determined that "the best

approach would be to identify a similar facility of comparable uses, sensitivities, and

topography/geography (background effects, etc.) as a base-line to recommend the allowable noise

restrictions at this facility." Acentech had identified the Lime Rock facility in Lakeville,

Connecticut as an appropriate facility for comparison purposes, and the ACOE concurred.

52.     The race track in the Village of Lime Rock, Connecticut, has generated noise

which has resulted in litigation spanning almost 30 years.  This village is, much like Tamworth, a

mainly residential rural area to which visitors and residents are drawn because of the peace and

tranquility it offered.  In a decision holding that noise from that track constituted a public

nuisance, the court stated as follows:

> When these races take place, or when the track is in use, the noise and roar of car
> engines caused by the operation of the vehicles upon the track can be heard for a
> considerable distance away.  The track is constructed with a number of sharp
> curves, and the squealing of brakes, screeching of tires, and other noises emanating
> from the operation of the cars upon the track can be heard throughout the Village of
> Lime Rock.
>
> …
>
> During racing events or speed tests … [t]he noise and sounds, particularly when the
> vehicles are unmufflered, reach such intensity that they can sometimes be heard for
> some distance beyond the village depending upon wind and atmospheric
> conditions.

(Adams v. Vail, Superior Court, Litchfield County, Connecticut, Docket No. CD58-001-54-59S,

Memorandum of Decision dated May 8, 1959 at pp. 2-3.)

53.     As noted in the ACOE permit, the Lime Rock facility is currently subject to "a

drive-by sound limit of 89 dBA measured 50 feet from the source."  Significantly, this is an $L_{MAX}$

limit, rather than an $L_{EQ}$ limit.  The distinction between the two is explained in the Tech

Environmental report referenced above:

> The $L_{MAX}$ is the near instantaneous maximum sound level.  The $L_{EQ,}$ or equivalent
> sound level, is the steady-state sound level over a period of time that has the same
> acoustic energy as the fluctuating sounds that actually occurred during that period.
> It is commonly referred to as the average sound level.

54.     The Acentech Report discussed the implementation of this limit at the Lime Rock

facility as follows:

> The residential communities near Lime Rock Park reached an agreement with that
> facility in which a drive-by limit of 89 dBA (at 50 feet) is enforced by the facility.
> This limit is strictly enforced and the facility peacefully coexists with the facility
> (according to Lime Rock Park personnel, from a personal telephone conversation).

55.     The Acentech report ultimately concluded that the noise impacts at the Tamworth

facility had an even <u>greater</u> potential adverse impact than the noise impacts at Lime Rock Park for

the following reasons:

> Also note that the Lime Rock Park track is on a relatively level elevation in a
> valley, and the proposed track will be built on the side of a mountain that overlooks
> the Tamworth community.  This provides less opportunity for any topographic
> shielding than is available for Lime Rock Park.  There is also a 40-foot tall rock
> ledge that is planned for an upper section of the track which provides a large
> surface to reflect the sound to the community it faces.  These topographic features
> will send more sound into the community than is the case at Lime Rock Park.
> Having visited the project site, I experienced the low background sound levels
> (documented in the TE report) in the area resulting from the few sound sources in
> the area.  The combination of low background levels and topography more suited
> to send sound from the project site into the community would not justify higher
> sound limits for this project over those at the Lime Rock Park facility.

Thus, the Acentech report concluded that "instituting a track-side noise limit that is <u>at least as</u>

<u>restrictive</u> as that used at the Lime Rock Park facility is a practical compromise to have the

proposed facility peacefully coexist with the Tamworth residential community."

56.     While the permit issued by the ACOE purported to rely on and adopt the Acentech

report, in actuality the ACOE adopted a noise limit proposed by MH that was directly at odds with

the conclusions reached by Acentech.  Specifically, MH proposed and the ACOE accepted the

following limit:  "No vehicle may exceed an average sound limit of 92 dBA at 50 feet from the

source, nor a maximum sound limit of 99 dBA at 50 feet from the source."

57.     The ACOE justified its acceptance of MH's proposed limit on the following basis:

The applicants' proposed Operating Plan . . . appears to be acceptable when compared to the recommendations of Acentech. The difference of 3 dBA (approximately a 3.4% dBA increase above the recommended 89 dBA allowable sound limit) would not be an unreasonable increase in sound impact when weighed against the practicability of the applicant's ability to accomplish his project purpose of operating a profitable and sustained motorsports operation by attracting willing clientele. Furthermore, the allowable maximum sound limit value of 99 dBA does not appear to be unreasonable when considering that all sounds are actually an instantaneous averages [sic] of high and low sound fluctuations. . .

58.     There are several flaws in the ACOE's reasoning.  First, in comparing Lime Rock's 89 dBA limit to MH's proposed 92 dBA limit, the ACOE compared apples to oranges.  As stated above, the Lime Rock limit is "a drive-by sound limit of 89 dBA measured at 50 feet from the source," which is an instantaneous maximum sound level.  Acentech found that the Tamworth facility should be subject to a track-side noise limit "that is at least as restrictive as that used at the Lime Rock Park facility."  Yet the ACOE did not compare this Lime Rock instantaneous limit to the instantaneous maximum limit proposed by the Applicant (99 dBA) but rather to what MH terms "an average sound limit" at 92 dBA.  The ACOE's comparison of the Lime Rock limit of 89 dBA to MH's proposed "average" limit of 92 dBA is wholly inappropriate.  The Lime Rock limit is an instantaneous maximum that applies to each vehicle.  The same limit proposed by MH and adopted by the ACOE is 99 dBA, not 92 dBA.  That is a difference of 10 dBA.  As discussed further below, the maximum limit allowed by the ACOE permit would be heard as twice as loud and represents ten times the sound energy as the value recommended as a minimum by the ACOE's own expert.

59.     The ACOE's second error is its adoption of MH's proposed use of an "average" sound limit. Acentech concluded that it would be inappropriate to use an "average value" in imposing noise restrictions on a race track.  Moreover, neither the ACOE's permit nor MH's operating plan make clear what "an average sound limit" is or how it is to be measured.  The

Corps' permit states that "no vehicle" may exceed this average limit.  However, under MH's

proposal, its "average" limit is not applied to each vehicle as specified by the Corps' permit.

Indeed, it is unclear how an average sound limit could ever be applied to an individual vehicle.

Furthermore, implementation of an "average" sound limit has, to the best of our knowledge, never

been imposed at any racing venue in any jurisdiction.  That is because such a limit is undefined

and effectively unenforceable.

      60.    The ACOE's third error is that it neglected to recognize that decibels are units on a

logarithmic scale.  When the ACOE (erroneously) compared the Lime Rock limit of 89 dBA to a

limit of 92 dBA, it concluded that this 3 dBA difference was only a 3.4% increase.  That would be

true on a straight numeric scale.  However, on a logarithmic scale, a sound measured at 92 dBA is

twice as (100 percent more) intense than a sound measured at 89 dBA, and would be heard as 23%

louder.  Significantly, a sound measuring 99 dBA (as an instantaneous maximum) is 10 times

(1,000 percent) more intense than a sound measuring 89 dBA (as an instantaneous maximum) and

is heard as twice as loud.  Not only has the ACOE incorrectly compared the applicant's proposed

"average" limit of 92 dBA to Lime Rock's instantaneous maximum limit of 89 dBA, but it also

understated the difference between those limits by virtue of the logarithmic nature of decibel

measurements.

      61.    The ACOE's fourth error is that it cited absolutely no support for its conclusion

that imposing a limit of 89 dBA would render impracticable "the Applicant's ability to accomplish

his project purpose of operating a profitable and sustained motorsports operation by attracting

willing clientele."  The Lime Rock facility is subject to the 89 dBA limit and there is no

information in the record that compliance with such a limit renders that facility unprofitable or

impracticable.  In fact, it has been operating for many years subject to these noise restrictions.  In

short, the ACOE cited no evidence in the record that would justify imposition of a <u>less</u> restrictive noise limit at the Tamworth facility than exists at the Lime Rock Park facility, particularly where its own expert recommended that the Tamworth facility be subject to limits <u>at least as stringent</u> as those at Lime Rock Park.

62.     The ACOE appropriately recognized noise as a legitimate concern in consideration of this permit application.  The ACOE appropriately hired its own expert to address the issue.  However, when armed with the conclusions of its own expert, the ACOE approved a noise limit proposed by MH completely at odds with the conclusions of ACOE's expert.  Specifically, while the ACOE's expert concluded that the Tamworth facility should be subject to "a track-side noise limit that is at least as restrictive as that used at the Lime Rock Park facility", the ACOE approved a noise limit that is effectively <u>twice as loud</u> as that at the Lime Rock Park facility.  The ACOE states that it was following the recommendations of its expert, when in fact just the opposite is true.

63.     The ACOE's decision to adopt the noise restriction proposed by the applicant MH, which was directly at odds with the conclusion of the ACOE's own expert, constituted an abuse of discretion and rendered the ACOE's decision arbitrary and capricious.  As set forth above, the ACOE was mandated by statute to impose "conditions under which [the proposed activity] will be allowed to occur" following a balancing of "the benefits which reasonably may be expected to accrue from the proposal . . . [and] its reasonably foreseeable detriment."  Here, the ACOE reached a decision directly counter to the evidence before it without explanation.  When the Plaintiffs' request for reconsideration, which set forth the information in paragraphs 43 to 62 above, presented the ACOE with an opportunity to explain the basis for a decision that was

contrary to the evidence before it, it declined to do so, stating only that it "reaffirmed its permit decision."

64.     For the foregoing reasons, the ACOE's decision to adopt the noise limitation proposed by the Applicant MH was arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law.  On the basis of the evidence before it, which the ACOE accepted, the ACOE was required to impose a noise limit at least as restrictive as that imposed at the Lime Rock Park facility: a limit of 89 dBA on each vehicle as an instantaneous maximum measured 50 feet from the source.

**PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, Plaintiffs pray that this Court grant the following relief against the Defendants as follows:

A.     Adjudge and declare that Defendants have violated Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and its implementing regulations;

B.     Adjudge and declare that the ACOE's permit issued on August 26, 2005, allowing Defendant MH to dredge and fill wetlands in connection with its construction of its motorsports country club and racetrack, is unlawful, invalid, null and void;

C.     Remand this case to the Defendants for further administrative action to officially suspend and/or revoke the permit pursuant to 33 C.F.R. § 325.7

D.     Award the Plaintiffs their attorneys' fees, costs and other expenses in bringing this action; and,

E.     Grant such further relief as may be just and proper.

Respectfully submitted,

**Huntington and Caitriona B. Barclay, et al,**

By Their Attorneys

**RATH, YOUNG AND PIGNATELLI,  PC**

Dated:  September 29, 2006      By:  /s/ Andrew W. Serell
                                                    Andrew W. Serell (Bar No. 2298)
                                                    One Capital Plaza
                                                    P.O. Box 1500
                                                    Concord, NH  03302-1500
                                                    (603) 226-2600
                                                    aws@rathlaw.com

Dated:  September 29, 2006      By:  /s/ Tracy A. LaChance
                                                    Tracy A. LaChance (Bar No. 15592)
                                                    One Capital Plaza
                                                    P.O. Box 1500
                                                      Concord, NH  03302-1500
                                                    (603) 226-2600
                                                    tal@rathlaw.com