UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Huntington Barclay, et al.,
     Plaintiffs

     v.                            Civil No. 06-cv-368-SM
                                    Opinion No. 2008 DNH 037
The United States Army Corps
of Engineers; Lt. General Carl A.
Strock; Col. Curtis Phalken; and
Motorsports Holdings, LLC,
     Defendants

## **O R D E R**

Plaintiffs are owners of property in and around the town of Tamworth, New Hampshire.  They bring this action seeking a judicial declaration that the U.S. Army Corps of Engineers (the "Corps") violated Section 404 of the Clean Water Act when it granted Motorsports Holdings a permit to place fill material within wetland areas on its land in Tamworth.  Motorsports Holdings sought the permit to disturb approximately 0.73 acres of wetlands as part of its plan to construct a motorsports country club with an associated 3.1 mile road course on a 251-acre site in Tamworth.

Interestingly, plaintiffs' challenge is not related to any potential adverse effects the proposed facility might have on water quality in the area.  Instead, plaintiffs complain that the

Corps approved a noise limit on the project that was excessive and at odds with the recommendations of the Corps' own consultant.  Consequently, say plaintiffs, the decision amounted to an abuse of discretion and renders the Corps' issuance of the permit arbitrary and capricious.

Pending before the court are the parties' cross-motions for summary judgment.  For the reasons set forth below, defendants' motions are granted and plaintiffs' motion is denied.

## Standard of Review

I.  <u>Summary Judgment</u>.

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence."  <u>Int'l Ass'n of</u>

2

<u>Machinists & Aerospace Workers v. Winship Green Nursing Ctr.</u>, 103
F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).


     Here, the parties agree that there are no genuinely disputed
material facts.  The sole question presented is a legal one:
Whether the Corps' decision to issue Motorsports Holdings a
permit under the Clean Water Act was "arbitrary, capricious, an
abuse of discretion or otherwise not in accordance with
applicable law."  5 U.S.C. § 706(2)(A).  As the court of appeals
for this circuit has observed:

>      the task of a court reviewing agency action under the
> [Administrative Procedures Act's] "arbitrary and
> capricious" standard, 5 U.S.C. § 706(2), is to
> determine whether the agency has considered the
> relevant factors and articulated a rational connection
> between the facts found and the choice made.  If the
> agency decision was based on a consideration of the
> relevant factors and there has not been a clear error
> of judgment, then the agency decision was not arbitrary
> or capricious.

<u>Dubois v. U.S. Dep't of Agriculture</u>, 102 F.3d 1273, 1284-85 (1st
Cir. 1996) (citations and internal punctuation omitted).  The
"arbitrary and capricious" standard is, then, a highly
deferential one, and the Corps' decision is entitled to a
"presumption of regularity."  <u>Citizens to Preserve Overton Park,
Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971).  <u>See also</u> <u>Adams v.
United States EPA</u>, 38 F.3d 43, 49 (1st Cir. 1994) ("Under the

APA, the applicable standard of review is whether the EPA's
action was 'arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law.'  A court should not set
aside agency actions as arbitrary and capricious unless the
actions lack a rational basis.  The scope of review under the
'arbitrary and capricious' standard is therefore narrow, and a
court should not substitute its judgment for that of the
agency.") (citations omitted).

## Background

In October of 2003, Motorsports Holdings ("Motorsports") met
with state and federal authorities to discuss its proposal to
build a motorsports facility, including a 3.1 mile European-style
road course, in Tamworth, New Hampshire.  The site of the
proposed facility is "not in a populated residential area, but
rather along Rt. 25, a moderately heavily traveled state road by
commercial vehicles, logging trucks, etc."  Environmental
Assessment and Statement of Findings (the "EA/SOF"), Admin. Rec.,
vol. 1, page 131.  Additionally, "the site abuts undeveloped
land, with the exception of the Lakes Region Fire Apparatus
Facility to the north and the local town's transfer station to
the west.  Other nearby commercial/industrial uses include: an

oil storage depot, a private garage facility, on-going logging operations and on-going gravel pit operations." Id.

Initially, Motorsports had hoped the Corps would consider the project eligible for evaluation under the streamlined New Hampshire State Programmatic General Permit ("NHSPGP") procedures, rather than the more comprehensive individual permit process. But, in January of 2004, the Corps concluded that due to potential impacts on local aquifers and in the public interest, the project would not be considered under the NHSPGP. Instead, Motorsports would be required to submit an application to the Corps for a permit under section 404 of the Clean Water Act, authorizing it to discharge fill material into the 0.73 acres of wetlands located on the 251-acre property.

As part of its application for a discharge permit under the Clean Water Act, Motorsports outlined its proposed operating plan for the facility. Under that plan, the facility would be open approximately 200 days each year (April 15 to October 31), seven days a week, from 8:00 a.m. to 7:00 p.m. On Sundays, however, no vehicles would be permitted on the track until after 11:00 a.m. Among other things, Motorsports proposed to "follow the standards and requirements as outlined in Section 11 – 'Technical & Safety'

5

and Section 12 – 'Sound Control' of the Sports Car Club of
America's 2005 General Rules and Specifications."  Admin. Rec.,
vol. 6, page 10.  As to noise emissions, however, Motorsports
proposed to enforce limits more strict than the 103 dBA Lmax
limit suggested by the guidelines of the Sports Car Club of
America.  Specifically, Motorsports proposed the following limits
on noise generated at the facility:

> [T]he average sound generated during road course
> sessions (i.e., when vehicles are driving on the road
> course) will not exceed 92 dBA at 50 feet from the road
> course.  The 92 dBA average sound generated per driving
> session is based upon the range of vehicles on the road
> course with an Lmax value at 50 feet of 99 dBA (high
> range), 92 dBA (mid range), and 85 dBA (low range)
> respectively.
>
> In addition, the facility will not allow any road
> course activity before 11:00 AM on Sundays.  During
> this mandatory "quiet time" vehicles will not be
> allowed to rev their engines in the paddock or garage
> area.  The facility will generate no noise, over
> background levels, before 11:00 AM on Sundays.

Id. (emphasis in original).  Additionally, Motorsports proposed
to monitor sound emissions at the facility and to implement a
"three strikes" policy, under which vehicles found to exceed the
noise limits would be removed from the track and directed to make
any changes necessary to comply with the noise limits.  Any
vehicle that exceeded those limits after two opportunities to

comply would be ordered off the course and exposed to possible sanctions.

    As part of its application, Motorsports submitted a study conducted by its expert, Tech Environmental, on the expected sound impacts from the road course.  That report concluded that the facility would be operated consistent with the standards set by the Sports Car Club of America and, generally speaking, would not create sound levels greater than those currently occurring on Route 25 and local roads adjacent to the facility.  Accordingly, Tech Environmental opined that, under the sound restrictions proposed by Motorsports, changes to daytime sound levels in the neighboring community would be minimal.  Admin. Rec., vol. 6, pages 148–49.  See also Id. at pages 42, 48.

    In response to that report, a group opposed to the project, FOCUS Tamworth, submitted its own expert report prepared by sound consultant HMMH.  That report concluded that noise limits more strict than those proposed by Motorsports would be necessary in order to prevent noise from the facility from adversely affecting the public.  Accordingly, HMMH proposed the following restrictions:

Sound generated by the racetrack shall not exceed 89
dBA as measured fifty (50) feet from any point on the
racetrack for any one vehicle on the racetrack and 69
dBA at any point on the property line of the racetrack.
Both maximum values are instantaneous maximums as
measured with sound level meter slow response.

Admin. Rec., vol. 6, page 137.

Presented with two expert reports that reached quite

different conclusions and recommendations, the Corps hired its

own consultant, Acentech.  James Cowan of Acentech toured the

site of the proposed facility and surrounding community.  He also

reviewed the two expert reports submitted to the Corps, as well

as the underlying data that formed the basis of the conclusions

and recommendations contained in those reports.  Among other

things, Mr. Cowan observed:

Racetracks around the country have adopted a variety of
limitations to peacefully coexist with nearby
residential communities.  These limitations have
typically taken one of two forms – either the racetrack
controls the noise of its participants by enforcing a
drive-by sound level limit (typically at a distance of
50 or 100 feet from passing vehicles) in the facility
or the communities enforce the racetrack noise limits
by instituting a noise ordinance limit outside the
facility.  Reasonable sound limits would consider what
has worked for other communities while not overly
restricting the operations of the racing facility.

When asked about a comparable facility to the one being
proposed here, the developer referenced the Lime Rock
Park facility in Lakeville, CT.  The residential
communities near Lime Rock Park reached an agreement

8

> with that facility in which a drive-by limit of 89 dBA
> (at 50 feet) is enforced by the facility.  This limit
> is strictly enforced and the facility peacefully
> coexists with the community.

Admin. Rec., vol. 6, page 69.  Mr. Cowan then concluded by

opining that, "[g]iven the information discussed above,

instituting a track-side noise limit that is at least as

restrictive as that used at the Lime Rock Park facility is a

practical compromise to have the proposed facility peacefully

coexist with the Tamworth residential community." Id. at 70.


    The facility at Lime Rock operates from mid-March through

Mid-November each year (approximately 205 days per season).  The

facility is not open on Sundays.  On Tuesdays from noon to 6:00

p.m., it operates without any sound restrictions.  Likewise, on

an additional 30 days during the season – Memorial Day, the

Fourth of July, Labor Day, and numerous Saturdays – there are no

sound restrictions.  So, unlike the proposal submitted by

Motorsports (which provides that there would be no days on which

the facility would operate without noise restrictions), the

facility at Lime Rock operates without any sound restrictions

nearly one-third of the time (i.e., approximately 65 days out of

205).  On days when sound restrictions are in place at Lime Rock,

there is a drive-by limit of 89 dBA Lmax (at 50 feet).

Although not referenced in Mr. Cowan's report, the Corps also had before it information relating to the operations and noise level restrictions at several other racetrack facilities in the United States which were identified as being similar to the proposed facility in Tamworth.  <u>See, e.g.</u>, Admin. Rec., vol. 6, pages 12-16.[1]  Of those six racetrack facilities, only one (BeaveRun) is subject to noise restrictions more strict than those Motorsports proposed to implement at its facility in Tamworth.  Two of those facilities (Virginia International Raceway and GingerMan Raceway) operate without any noise restrictions at all, and one of them – GingerMan – is located within 1,000 yards of four churches and several private residences.  Admin. Rec., vol. 6, page 12.  Two other facilities (Autobahn Country Club and Summit Point) have noise limits (measured at 50 feet from the source) above 100 dBA (i.e., 105 and 103 dBA, respectively).  And, finally, New Hampshire Motor Speedway (formerly known as the New Hampshire International Speedway or NHIS) enforces a 99 dBA Lmax at 50 feet from the

---

[1]     The referenced pages summarize noise abatement practices and noise level restrictions at GingerMan Raceway in New Haven, Michigan; AutoBahn Country Club, in Joliet, Illinois; Virginia International Raceway, in Alton, Virginia; BeaveRun Motorsports Complex, in Big Beaver, Pennsylvania; Summit Point Raceway, in Summit Point, West Virginia; and New Hampshire Motor Speedway (Club events only; not NASCAR events), in Loudon, New Hampshire.

source for all club events – the same limit proposed by
Motorsports for its Tamworth facility.

After considering all the evidence before it, the Corps
concluded that Motorsports' proposed noise limits (i.e., a
maximum sound limit of 99 dBA at 50 feet from the source,
resulting in an average sound limit of 92 dBA at 50 feet from the
source) were acceptable.  It then determined that, "[a]fter
weighing favorable and unfavorable effects as discussed in this
document, [the Corps' finds] that this project is not contrary to
the public interest and that a Department of the Army permit
should be issued."  EA/SOF at 25, Admin. Rec., vol. 1, page 151.

Plaintiffs challenge that portion of the Corps'
Environmental Assessment and Statement of Findings which
addresses noise emissions, asserting that the "decision to adopt
the noise restriction proposed by the applicant [Motorsports],
which was directly at odds with the conclusion of the [Corps']
own expert, constituted an abuse of discretion and rendered the
[Corps'] decision arbitrary and capricious."  Amended complaint
(document no. 18) at para. 63.  Specifically, plaintiffs assert
that "(1) the [Corps'] explanation for adopting that restriction
'runs counter to the evidence before the agency'; (2) the

11

[Corps'] decision is not based upon 'a reasoned evaluation of the relevant factors'; and (3) fundamentally, the [Corps'] decision does not 'make sense.'"  Plaintiffs' memorandum (document no 29-2) at 19-20.

## Discussion

Section 404 of the Clean Water Act, and the related federal regulations, authorize the Secretary of the Army, acting through the Corps of Engineers, to regulate the discharge of fill material into wetland areas through the issuance of permits, after notice and opportunity for public comment.  When a party challenges the issuance of such a permit, the governing standard of review is, as noted above, highly deferential of the Corps' decision.  That decision may be set aside only if the reviewing court concludes that it was "arbitrary and capricious," or amounted to an abuse of discretion, or was contrary to applicable law.  Given that highly deferential standard of review, the Corps' decision to issue Motorsports a permit under Section 404 of the Clean Water Act is entitled to a "presumption of regularity," Citizens to Preserve Overton Park, 401 U.S. at 416, and may be vacated only if "lack[s] a rational basis," Adams, 38 F.3d at 49, or is the product of a "clear error of judgment," Dubois, 102 F.3d at 1285.  Here, the court cannot conclude that

the Corps acted outside the scope of its wide discretion in
issuing the permit.

The administrative record in this case consists of more than
4,500 pages, divided into nine volumes.  Plaintiffs do not assert
(nor is there any suggestion in the record that) the Corps'
failed to consider all the evidence presented to it.  Rather,
plaintiffs claim the Corps reached an unwarranted and
unjustifiable conclusion when, after evaluating that evidence, it
determined that operation of the Motorsports' facility subject to
the proposed noise limits would <u>not</u> have "an unacceptable adverse
effect on municipal water supplies, . . . wildlife, or
recreational areas."  33 U.S.C. § 1344(c).  <u>See also</u> EA/SOF at
25, Admin. Rec., vol. 1, page 151.

Although plaintiffs concede that the Corps was not bound by
the recommendations made by Mr. Cowan of Acentech, <u>see</u>
plaintiffs' memorandum (document no. 29-2) at 20, they assert
that the Corps essentially ignored those recommendations and, in
so doing, failed to adequately explain its reasons for reaching
the conclusions it did.  Plaintiffs suggest that, had the Corps
simply adopted Mr. Cowan's suggestion and required Motorsports to
adhere to sound limitations "at least as restrictive" as those

13

imposed on the facility at Lime Rock, its decision would not be subject to attack.  Importantly, however, Mr. Cowan's report fails to acknowledge the fact that the facility at Lime Rock operates nearly one-third of the time with no sound restrictions whatsoever.[2]

Plainly, the sound restrictions applicable at Lime Rock were the product of substantial negotiation and compromise (and litigation) between the facility's owner and the community and they represent a careful balancing of the needs/desires of the owner and those of local residents.  So, for plaintiffs (and Mr. Cowan) to suggest that the Corps should have required Motorsports to adopt the most restrictive elements of those sound controls, without also allowing it the benefit of the more lenient elements, is not terribly persuasive.  It probably also bears noting that Motorsports never proposed, nor does it appear that plaintiffs would have accepted as reasonable, sound restrictions precisely in line with those adopted at Lime Rock (i.e., substantial periods of time without any sound restrictions at

---

[2]    It appears Mr. Cowan was not aware that the facility at Lime Rock operates without any noise restrictions for approximately one-third of its season.  <u>See, e.g.</u>, Admin. Rec., vol. 6, page 69 ("The residential communities near Lime Rock Park reached an agreement with that facility in which a drive-by limit of 89 dBA (at 50 feet) is enforced by the facility.  This limit is strictly enforced . . ..").

all).  It is, then, somewhat perplexing that plaintiffs
continuously suggest that the Corps could have (and probably
should have) required Motorsports to operate its facility subject
to noise restrictions "at least as restrictive" as those
applicable to Lime Rock.  See, e.g., Plaintiffs' memorandum at
20.  The proposal advocated by plaintiffs is far more restrictive
than the noise limits governing the facility at Lime Rock, and
one might suspect plaintiffs would be far less content with a
change from the regimen the Corps actually approved to that which
Lime Rock imposes.

Rather than focusing exclusively on Mr. Cowan's suggestion
that the Corps require Motorsports to operate its facility
subject to the 89 dBA limit applicable (sometimes) at Lime Rock,
the Corps plainly reviewed and considered all of the evidence
before it – including evidence relating to the noise restrictions
imposed at other, similar facilities.  The proposal submitted by
Motorsports and accepted by the Corps provides that the maximum
sound generated at the facility (measured at 50 feet from the
source) would be 99 dBA and, on average, the sound produced at
the facility during operating times would be 92 dBA (again, at 50
feet from the source).  That proposed operating plan not only
provides more substantial limits on sound emissions than those

15

recommended by the Sports Car Association of America, <u>see</u> Admin.
Rec., vol. 6, pages 48-50, but it also provides more substantial
limits than most of the other facilities described in the record
before the Corps.  According to documentation submitted to the
Corps, only one of seven track facilities that were identified as
being comparable to Motorsports' proposed facility (i.e.,
BeaveRun) was subject to more stringent sound limitations.[3]

    In light of the record evidence on sound restrictions at
similar facilities, and the various expert opinions relating to
sound generation at Motorsports' facility itself (including Mr.
Cowan's suggestions), it was not unreasonable, nor was it an
abuse of discretion, for the Corps to conclude that Motorsports'
proposed operating plan was acceptable.  And, the Corps more than
adequately explained the basis for that conclusion, stating:

> The applicants' proposed Operating Plan outlining the
> hours of operation, sound limits at the facility and
> monitoring/enforcement policy appears to be acceptable
> when compared to the recommendations of Acentech.  A
> difference of 3 dBA (approximately a 3.4% dBA increase
> above the recommended 89 dBA allowable sound limit)
> would not be an unreasonable increase in sound impact
> when weighed against the practicability of the

---

[3]     That calculation has assumed that, because Lime Rock
operates without sound restrictions for approximately one-third
of its season, it would, on average, produce sound emissions on
operating days at approximately 101 dBA, measured at 50 feet from
the source.  <u>See</u> Admin. Rec., vol. 6, page 16.

applicant's ability to accomplish his project purpose of operating a profitable and sustainable motorsports operation by attracting willing clientele. Furthermore, the allowable maximum sound limit value of 99 dBA does not appear to be unreasonable when considering that all sounds are actually an instantaneous average of high and low sound fluctuations (in this case an 85 dBA expected low operational value averaged against an expected 99 dBA high operational value to arrive at a target average mid-range operational value of 92 dBA).  The hours of operation will coincide with the town's interest of peace and quiet where vehicle track operation is limited between 8:00 AM – after the majority of people are out of bed – and 7:00 PM – before most people retire for the night and before many relax for the evening.  The mandatory "quiet time" on Sunday morning will ensure that sound from the facility will have no impact to church services in town.  The applicant's monitoring/ enforcement policy, if implemented diligently, will ensure that the above sound criteria are strictly adhered to by the users of the facility and track.  The shutting down of the track operation during the winter months will further diminish the potential for the generation of sound where tree leaf cover is not present to attenuate sound effects.  The town will have an active role in reviewing sound reports from the facility and bringing to the attention of the applicant of any infractions to the sound limits.  The applicant's "three-strike policy" should be able to discourage any user from deviating from the applicant's sound limit since the users have a vested interest in utilizing their vehicles at the track after making a substantial commitment in money, time and travel to the facility for that specific purpose.  The applicant appears to be committed to adhering to the sound management provisions outlined in the Operating Plan and mitigating any deviations thereof. Additionally, the Operating Plan will be submitted to the town to provide a level of certainty associated with the operation of the facility and will outline the parameters and rules for the day-to-day operation of the facility.  The Operating Plan of the applicant pertaining to the generation and management of sound impacts due to the proposed project does not present any significant impacts to the public interest based on

17

the best information available on the proposed sound
impacts.

EA/SOF at 13-14, Admin. Rec., vol. 1, pages 139-40.  Accordingly,

the Corps concluded that:

> The project does not present a significant impact to
> the aquatic environment, and but for the issue of noise
> generation on site, the project would have been
> eligible for review under the New Hampshire Special
> General Programmatic Permit program.  Noise and all
> relevant public interest factors were carefully
> evaluated.  The proposed alternative represents the
> least damaging practicable alternative [and] any
> unavoidable impacts to the aquatic resources will be
> adequately compensated for.  The Federal resource
> agencies have no objections to permit issuance and
> there are no unresolved issues.

Id. at 151.


    Finally, it is, perhaps, appropriate to address plaintiffs'

contention that the Corps cited "absolutely no support for its

conclusion that imposing a limit of 89 dBA would render

impracticable 'the applicant's ability to accomplish his project

purpose of operating a profitable and sustained motorsports

operation by attracting willing clientele.'"  Plaintiffs'

memorandum (document no. 29-2) at 25 (quoting EA/SOF at 13-14,

Admin. Rec., vol. 1, pages 139-40).  Contrary to plaintiffs'

suggestion, all the relevant evidence before the Corps suggested

(albeit implicitly) that road course facilities of the type

proposed by Motorsports cannot operate subject to sound emission limits less than 95 dBA Lmax (measured at 50 feet from the source).  Not a single comparable facility whose sound restrictions were before the Corps operates subject to a sound restriction of less than 95 dBA Lmax.  See Admin. Rec., vol. 1, page 16.  And, notably, plaintiffs have failed to identify any similar road course facilities that do operate subject to such restrictions.

As noted above, Lime Rock is subject to the 89 dBA Lmax limitation embraced by plaintiffs for only a portion of its operating season.  The other similar facilities referenced in the record (none of which appears to operate subject to the "hybrid" type of restrictions imposed on Lime Rock) all operate subject to sound restrictions at, or above, 95 dBA (i.e., 95, 99, 103, 105, unlimited, and unlimited).  The suggestion that the Corps should not have approved any operating plan submitted by Motorsports that included sound emissions above 89 dBA (for the entire operating season) is both unpersuasive and unsupported by the record.  It was, on the other hand, entirely reasonable for the Corps to conclude, based on the evidence before it, that a facility of the type proposed by Motorsports could not operate successfully if subjected to an 89 dBA Lmax sound limit.  And, as

19

noted above, the Corps adequately explained its conclusion that the restrictions proposed by Motorsports represented a fair and reasonable balance between the needs of the developer, the desires of the community, and the overall well-being of the local environment.

### Conclusion

Plaintiffs challenge the Corps' issuance of a permit under Section 404 of the Clean Water Act on very narrow grounds: they say the Corps acted arbitrarily and capriciously and/or abused its discretion when it determined that Motorsports' proposed operating plan, including a 99 dBA limit on sound emissions (resulting in an average of 92 dBA emissions), would <u>not</u> have "an unacceptable adverse effect on municipal water supplies, . . . wildlife, or recreational areas."  33 U.S.C. § 1344(c).  In attempting to carry their burden of proof, plaintiffs assert that the facility at Lime Rock is comparable to the one proposed by Motorsports and, therefore, the Corps should not have permitted Motorsports to proceed until it adopted sound emission limits at least as restrictive as those at Lime Rock.

There are, however, two aspects to the sound emission limits at Lime Rock: the first allows the facility to operate without

20

any sound restrictions at all for a substantial portion of its operating season, while the second imposes an Lmax limit of 89 dBA for the remainder of the season.  Plaintiffs suggest that the Corps should have imposed on Motorsports only the more strict aspects of the Lime Rock limitations and ignored those that permit operation without any noise restrictions.  The Court disagrees.

The Corps did not, however, require Motorsports to adopt such an operating plan.  Instead, after carefully reviewing the record before it, the Corps provided a reasonable, logical, and thorough explanation for its decision to accept Motorsports' original proposed operating plan (it rejected Motorsports' proposed amendment to that plan).  Plaintiffs have, then, failed to demonstrate that the Corps' issuance of the Section 404 permit sought by Motorsports constituted an abuse of discretion, nor have they shown that it was arbitrary and capricious.

For the foregoing reasons, as well as those set forth in the legal memoranda submitted by the Corps (documents no. 35-2 and 39) and Motorsports (documents no. 31-2 and 40), plaintiffs' motion for summary judgment (document no. 29) is denied.

21

Defendants' motions for summary judgment (documents no. 35 and 36) are granted.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

February 14, 2008

cc:  Andrew W. Serell, Esq.
     Laurel A. Bedig, Esq.
     Matthew R. Johnson, Esq.